IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| iMATTER UTAH, et al.,<br><br>   Plaintiffs,<br><br>  vs.<br><br>JOHN NJORD, et al.,<br><br>   Defendants | MEMORANDUM DECISION<br><br>AND ORDER |
| ALEX MATEUS for POSITIVE CHANGE UTAH,<br><br>   Plaintiff,<br><br>  vs.<br><br>JOHN NJORD, et al.,<br><br>   Defendants. | Case No. 2:11-cv-394 |

This case arises out of permitting problems that were encountered by two groups who wished to march down State Street in Salt Lake City to raise awareness about climate change. The Utah Department of Transportation (UDOT) required the two groups, iMatter Utah and Positive Change Utah, to obtain insurance for the events and to sign an indemnification form that would protect UDOT and the State of Utah from liability for certain actions that might occur during the march. The members of the climate change groups argue that the insurance and indemnification requirements are unconstitutional because these provisions burden the exercise of the Plaintiffs' rights under the First Amendment of the United States Constitution. The UDOT responds that the requirements are content-neutral time, place, and manner restrictions that do not impermissibly restrict the Plaintiffs' speech. The parties have submitted motions for summary judgment and for partial summary judgment. For the reasons stated below, the court finds that the insurance and indemnification requirements are not constitutionally sound and

should not be enforced against the Plaintiffs as currently written.

FACTUAL BACKGROUND

I.      **Plaintiff iMatter Utah**

iMatter Utah is an unincorporated, voluntary association that holds weekly meetings to discuss issues of climate change and to brainstorm strategies to engage the community on these issues.  The Utah group is a chapter of iMatter, a nationwide organization that raises awareness about climate change and focuses on youth involvement.  The Utah chapter includes a number of students who attend high school in Salt Lake City and several adult leaders, including the three named plaintiffs in this lawsuit: Ryan Pleune, Lauren Wood, and Linda Parsons.

iMatter Utah organized a parade scheduled for May 7, 2011.  This Marade, as it was called by the group, sought to put pressure on Utah's political leaders to address climate change. The group planned to march along State Street past various key government buildings, including the Wallace F. Bennett Federal Building and the Salt Lake City and County Building.  The group applied for and received a free expression permit from Salt Lake City for the event, but because State Street is also a Utah state highway and therefore falls under the State's jurisdiction, the permit was conditioned on the group's ability to obtain an additional permit from UDOT.

A.      Liability Insurance Requirement

Before granting a permit to march on a state highway, UDOT requires an applicant to obtain a liability insurance policy for the event:

> The applicant shall obtain and provide proof of liability insurance at time of application naming the "State of Utah, the Department and its employees" as additional insured under the certificate, with a minimum $1,000,000 coverage per occurrence and $2,000,000 in aggregate.

2

Utah Admin. Code r. 920-4-5.  iMatter Utah made some inquiries about the cost of such a policy

and determined that the premium would be approximately $2,500.  This estimate is in dispute,

and the Defendants assert that iMatter Utah could obtain a policy for a much lower premium of

$365.  The Honorable Clark Waddoups, during a hearing in which he denied the Plaintiffs'

Motion for a Temporary Restraining Order, found that the Defendants' estimate for the insurance

premium was more credible.  (*See* Hr'g Tr. 7-8, May 5, 2011, Dkt. 17.)  Regardless of the

amount of the premium, iMatter Utah contends that it is a voluntary association with no assets

and that it is unable to pay for an insurance policy.

  Mr. Pleune contacted UDOT and requested that the insurance requirement be waived on

the grounds that the event consisted of political speech and free expression and was therefore

protected by the First Amendment.  UDOT responded that it did not "treat a political and free

speech event any different from other events" and denied Mr. Pleune's request.  (*See* Email from

Mark Velasquez, Ex. A to Am. Compl., Dkt. 20.)  UDOT explained that, for any use of a state

road other than normal traffic movement, the liability insurance was mandatory and required by

Utah state regulations.  *See* Utah Admin. Code r. 920-4-5.

  B. <u>Indemnification Requirement</u>

  UDOT also required iMatter Utah to sign a Waiver and Release of Damages.  The waiver

stated that the participants in the event agreed to "release, remise, waive and forever discharge

the State of Utah, the Utah Department of Transportation, the Utah Transportation Commission,

the Utah Highway Patrol, and their officers, agents, and employees from all liability, claims,

demands, actions or causes of action" that could result from participation in the march.  (Waiver

and Release of Damages, Ex. C to Am. Compl., Dkt. 20.)  UDOT demanded that all participants

in the event sign the waiver and required iMatter Utah to submit the application at least fifteen

days before the scheduled parade.

   After iMatter Utah filed this lawsuit, UDOT amended its regulations.  UDOT no longer

requires participants in a free speech event to sign the Waiver and Release of Damages.  *See* Utah

Admin. Code r. 920-4-6.  Instead, UDOT prepared an indemnification form for use in free speech

events.  This form requires that a permittee:

> indemnify, defend and hold the State of Utah [et al.] harmless from and against
> any claim or demand for loss, liability or damage . . . arising out of or resulting
> from: (a) any act or omission by the Permittee, its officers, agents, employees or
> any persons under Permittee's control insofar as permitted by law concerning
> Permittee's use or occupancy of the state road right-of-way; and (b) from and
> against all actions, suits, damages and claims brought or made by reasons of
> Permittee's non-observance or non-performance of any of the terms of the Permit
> or the rules, regulations, ordinances and laws of the federal, state or local
> governments.

*Indemnification Form*, http://www.udot.utah.gov/main/uconowner.gf?n=12862231458643644

(last visited Oct. 31, 2013) [hereinafter *Indemnification Form*].  UDOT also withdrew its demand

that all participants sign the form fifteen days before the event.

   iMatter Utah did not obtain an insurance policy or sign the original waiver.  Instead, the

group filed this lawsuit a few days before the march and sought a temporary restraining order.

Judge Waddoups denied this request on May 5, 2011.  He found that iMatter Utah had not shown

that it was substantially likely to succeed with its suit and that it had failed to meet its burden of

establishing that the group would suffer irreparable harm.  (*See* Hr'g Tr. 3, 11, May 5, 2011,

Dkt. 17.)

   Despite failing to obtain a TRO, iMatter Utah proceeded with its Marade.  The group

chose to march along State Street on the sidewalks instead of the street itself, since the parties

agreed that marching on the sidewalks did not require a UDOT permit.  Approximately 150–200

people participated in the event.  iMatter Utah asserts that obstructions as well as the narrowness

of the sidewalk made it difficult for the group to march in formation or unfurl the group's banner.

      iMatter Utah then organized a second march for September 24, 2011.  The group planned

to begin the procession with a rally on the front steps of the Utah State Capitol before proceeding

down State Street past the Federal Building to the City and County Building for a second rally on

Washington Square.  iMatter Utah again applied for a permit application from UDOT and was

again denied for its failure to obtain liability insurance and sign the indemnification form.

Although UDOT had amended its original waiver requirement to accommodate free speech

events as noted above, iMatter Utah maintained that the new indemnification form still did not

pass constitutional muster.  The group again marched down the sidewalks of State Street instead

of in the road.

## II.    Plaintiff Alex Mateus

      In August 2011, Plaintiff Alex Mateus formed a group known as Positive Change Utah to

advocate for issues involving climate change.  Mr. Mateus planned to have a parade on October

8, 2011, in which participants would march along State Street from the Utah State Capitol to the

Salt Lake City and County Building.  He applied for a permit from UDOT on August 29, 2011,

after he was granted a conditional permit for his march from Salt Lake City.  Like iMatter Utah,

Mr. Mateus was required to obtain a liability insurance policy and sign an indemnification form.

At the time, Mr. Mateus was unemployed and told UDOT that he could not afford the premium

for an insurance policy, which he believed would cost in the range of $300 to $500.  When

UDOT denied his request for a waiver, Mr. Mateus initiated a lawsuit which was later

consolidated with this case.  The Defendants note that Mr. Mateus cancelled the October 8

parade and that Positive Change Utah has since been inactive.

iMatter Utah and Mr. Mateus have both filed Motions for Partial Summary Judgment

(Dkt. 51 & 110) and the Defendants have filed a cross Motion for Summary Judgment (Dkt. 81).

Mr. Mateus also filed a Motion to Strike Affirmative Defenses (Dkt. 46), which the court denies

as moot because it presents arguments that are resolved by the various motions for summary

judgment.  Finally, the Defendants have filed a Motion to Exclude the Testimony of Dr. Andrew

Utterback (Dkt. 78), an expert who submitted a report on behalf of the Plaintiffs.

The Plaintiffs argue that the insurance and indemnification requirements violate the First

Amendment because they are not narrowly tailored to serve a significant governmental interest

and do not leave open ample alternatives for communication.  The Plaintiffs also challenge

UDOT's previous waiver and advance identification requirements and maintain that the

Defendants violated their due process rights under the Fourteenth Amendment by failing to

provide a mechanism through which the Plaintiffs could establish that they were indigent and

entitled to a permit.  Finally, the Plaintiffs seek damages for the harm they suffered, as well as

attorneys' fees and costs under 42 U.S.C. § 1983 and § 1988.

The Defendants dispute these claims and bring up several issues of justiciability.  First,

Defendants argue that iMatter Utah does not have standing to challenge the insurance

requirement because the group has not shown that it is indigent and unable to pay the necessary

premium.  Defendants additionally challenge the standing of Mr. Mateus, claiming that Mr.

Mateus has not adequately provided evidence that he was or is actually planning to hold a march.

The Defendants also contend that the Plaintiffs' claims related to the previous waiver and

advance identification requirements are moot because UDOT no longer asks for these forms from free speech groups.  Finally, the Defendants assert that they are entitled to qualified immunity for any damages claims against them.

ANALYSIS

I.      **Standard of Review**

The court grants summary judgment when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The court "view[s] the evidence and make[s] all reasonable inferences in the light most favorable to the nonmoving party."  *N. Natural Gas Co. v. Nash Oil & Gas, Inc.*, 526 F.3d 626, 629 (10th Cir. 2008).

II.     **Standing**

To maintain their challenge to the liability insurance and indemnification requirements, the Plaintiffs must establish constitutional standing with regard to the provisions challenged.  *See Allen v. Wright*, 468 U.S. 737, 750-51 (1984).  To do so, they must allege: (1) a "distinct and palpable" injury-in-fact that is (2) "fairly traceable" to the challenged provision or interpretation and (3) would "likely . . . be redressed" by a favorable decision.  *Id.* at 751.  The Defendants argue that both iMatter Utah and Mr. Mateus fail to carry this burden.  The Defendants claim that iMatter Utah cannot challenge the lack of an indigency exception in the UDOT requirement for liability insurance because the group has not adequately demonstrated that it is indigent.  The Defendants further maintain that Mr. Mateus has not suffered an injury that would be redressable by a favorable decision from the court because he has not shown that he was actually planning to have a parade or that he will organize such a parade in the future.

7

The court is not persuaded by the Defendants' arguments for a number of reasons.  Most importantly, the Defendants' complaint that iMatter Utah is not truly indigent assumes that the group has only brought an as-applied challenge to the insurance and indemnification requirements.  An as-applied challenge, in which a plaintiff argues that a law or regulation is unconstitutional as applied to her own speech or expressive conduct, is generally the more common type of suit.  But a plaintiff may also bring a facial challenge against a statute that "create[s] an unacceptable risk of the suppression of ideas."  *Sec'y of Md. v. Joseph H. Munson Co.*, 467 U.S. 947, 965 n.13 (1984) (citation omitted).

Here, the Plaintiffs advance both types of challenges.[1]  They argue that the requirements are unconstitutional as applied to them due to the lack of an indigency exception, but they also contend that the requirements are facially invalid for several other reasons, including that they are not narrowly tailored and fail to provide ample alternatives for speech.  In addition, the Plaintiffs assert that the insurance and indemnification provisions burden more speech than is permissible because they require a group to assume the financial risk of actions for which the group cannot otherwise be held liable.  These facial challenges to the regulations do not depend on the wealth

---

[1]A plaintiff may even bring a facial challenge in some circumstances on behalf of other parties that are not before the court.  The Supreme Court has recognized that challenges in the First Amendment are an "exception from general standing rules" where the challenger asserts that the restriction is "subject to facial review and invalidation" because it "has the potential to chill the expressive activity of others not before the court."  *Forsyth Cnty. v. Nationalist Movement*, 505 U.S. 123, 129 (1992); *see also United States v. Stevens*, 559 U.S. 460, 473 (2010) ("In the First Amendment context . . . this Court recognizes a second type of facial challenge, whereby a law may be invalidated as overbroad if a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." (citation omitted) (internal quotation marks omitted)).  Here, the court does not need to address the availability of an overbreadth facial challenge because the court finds that iMatter Utah has standing to bring a facial challenge to all the pertinent aspects of the insurance and indemnification requirements on its own behalf.

of the group that is applying for a permit.  iMatter Utah's failure to obtain a permit is therefore an injury-in-fact that is fairly traceable to the insurance and indemnification provisions that would likely be redressed by a decision in its favor on the arguments it raises in support of its facial challenge.

Even if iMatter Utah were only pursuing an as-applied challenge based on the lack of an indigency exception, the court finds that the group would still have standing.  The Defendants do not argue that iMatter Utah as a voluntary organization possesses enough funds to pay for the insurance policy.  Instead, the Defendants suggest that the group, whose national organization provides materials on fundraising for events, could have collected enough money for the premium if it had made an attempt to do so.  This assertion is speculative, and the possibility that the Plaintiffs might have been able to raise the requisite money does not defeat the Plaintiffs' standing to challenge what they allege is a financially onerous requirement.  The $365 figure cited as an estimate for the cost of the policy would have constituted a substantial percentage of the Plaintiffs' budget for the march, whose other expenses consisted mostly of signboards and decorations.

The Defendants argue that the court should look past the organization to examine the financial assets of its individual members.  Because some of the members of iMatter Utah are employed adults, the Defendants contend that these members of the group could have paid the cost of the insurance premium.  The Defendants note that members of an unincorporated association are personally liable for the debts of that association.  But the Defendants have not presented the court with any legal authorities holding that the court should therefore calculate the group's assets by adding up the assets of its individual members.

9

In any event, the facts demonstrate that UDOT's insurance and indemnification requirements did ultimately dissuade iMatter Utah from marching in the street.  The organization twice marched along the sidewalk instead of the street to communicate its message.  There is no evidence to suggest that iMatter Utah could have purchased an insurance policy but chose to forego its street march simply so that it could bolster its standing in this lawsuit.  Instead, it appears clear that the insurance and indemnification requirements had a deterrent effect on the group's planned march.  A favorable decision from this court could therefore redress the injury that iMatter Utah suffered from that deterrent effect.

For these reasons, the court finds that iMatter Utah has standing to bring both an as-applied and a facial challenge to UDOT's insurance and indemnification requirements.  Because the court holds that iMatter Utah has standing, there is no need to determine whether Mr. Mateus also has injury-in-fact standing.  *See Rumsfeld v. Forum for Academic & Institutional Rights, Inc.*, 547 U.S. 47, 57 n.2 (2006) ("[T]he presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement.").

## III.    Mootness of Previous Requirements

The Defendants argue that the court should dismiss as moot any challenges that the Plaintiffs raise concerning the previous waiver and the advance notification requirement.  As discussed above, UDOT originally required all participants in a free speech march to sign a Waiver and Release of Damages that absolved the State of Utah from any liability for incidents that might occur during the event.  Under the new regulations that UDOT adopted after iMatter Utah filed this lawsuit, permit applicants for a free speech event must sign an indemnification form but are no longer required to complete the Waiver and Release of Damages.  And because

10

only one person must sign the indemnification form, there is no longer any need for a group involved in a free speech event to provide advance notification of all the participants.

Based on these developments, the court agrees that the Plaintiffs' claims related to the previous waiver and advance notification requirements are moot. The Plaintiffs contend that the Defendants' voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice and that a finding of mootness would leave UDOT "free to return to its old ways." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 170 (2000). But there is no reason to believe that the new indemnification form represents anything other than a good-faith effort on the part of the Defendants to bring their regulations into compliance with the requirements of the First Amendment. *See Coe v. Town of Blooming Grove*, 567 F. Supp. 2d 543, 556 (S.D.N.Y. 2008), *rev'd in part on other grounds*, 429 F. App'x 55 (2d Cir. 2011) (holding that the plaintiff could no longer challenge two previous versions of a city ordinance even though the city had amended its ordinance after the lawsuit began because the amendments were made in good faith). There is no indication that the Defendants have any intention of again requiring all participants in a free speech event to sign the Waiver and Release of Damages. *See, e.g.*, *City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289 & n.11 (1982) (finding that the plaintiff's challenge to a previous version of a city ordinance was not moot where the city had expressed its intent to reenact the offending provisions if the litigation was dismissed). As a result, the Plaintiffs' claims for equitable relief based on the requirements that UDOT no longer enforces against free speech groups are moot.

The Defendants' change in conduct does not, however, moot the Plaintiffs' claim for compensatory and nominal damages. *See Ellis v. Bhd. of Ry., Airline & Steamship Clerks,*

11

*Freight Handlers, Express & Station Emps.*, 466 U.S. 435, 442 (1984) ("The amount at issue is undeniably minute.  But as long as the parties have a concrete interest, however small, in the outcome of the litigation, the case is not moot.").  The court will therefore address the Plaintiffs' damages claim below.

## IV.    Due Process

The Plaintiffs argue that the Defendants have violated their right to due process under the Fifth and Fourteenth Amendments of the United States Constitution because the Defendants refused to issue them a permit or otherwise provide a procedure by which the Plaintiffs could establish their indigency.  But the Plaintiffs have not provided any evidence that they had a protected property interest in the permit or the right to a specific type of procedure to determine indigency.  These claims are more appropriately addressed in the court's analysis of whether UDOT's current permitting scheme complies with the First Amendment.  Accordingly, the court grants summary judgment in favor of the Defendants on the Plaintiffs' due process claims.

## V.    Constitutionality of the Insurance and Indemnification Requirements

The Plaintiffs' First Amendment rights to speak and assemble are part of a "profound national commitment" to the principle that "debate on public issues should be uninhibited, robust, and wide-open."  *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964).  While the Supreme Court has established different levels of scrutiny for analyzing First Amendment violations depending on the location of the speech, the parties agree that State Street is a traditional public forum, where "the government's ability to permissibly restrict expressive conduct is very limited."  *United States v. Grace*, 461 U.S. 171, 177 (1983).  *See also Hague v. Comm. for Indus. Org.*, 307 U.S. 496, 515 (1939) ("[S]treets and parks . . . have immemorially

12

been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions.").  A traditional public forum like State Street must therefore "occasionally be made available for marching, picketing, and other expressive conduct."  *ACLU of Colo. v. City & Cnty. of Denver*, 569 F. Supp. 2d 1142, 1185 (D. Colo. 2008) (citation omitted).

Although traditional public fora are protected areas for public debate, the government may nevertheless impose some restrictions on free speech.  "Nothing in the Constitution requires the Government freely to grant access to all who wish to exercise their right to free speech on every type of Government property without regard to the nature of the property or to the disruption that might be caused by the speaker's activities."  *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 US. 788, 799-800 (1985).  The Supreme Court has therefore held that restrictions on the time, place, and manner of speech are permissible, even in public fora.  *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293 (1984).

But even time, place, and manner restrictions "can be applied in such a manner as to stifle free expression."  *Thomas v. Chicago Park Dist.*, 534 U.S. 316, 323 (2002).  The Supreme Court has articulated four criteria that permissible time, place, and manner restrictions must satisfy: (1) they must be justified without reference to the content of the regulated speech; (2) they must be narrowly tailored to serve a significant governmental interest; (3) they must leave open ample alternative channels for communication of the information; and (4) they must not delegate overly broad licensing discretion to a government official.  *See Clark*, 468 U.S. at 293 (citing first three requirements); *Forsyth Cnty. v. Nationalist Movement*, 505 U.S. 123, 130 (1992) (recognizing fourth requirement).  Because these requirements are framed conjunctively, a valid restriction

13

must satisfy all four criteria.

For the reasons stated below, the court finds that UDOT's liability insurance and indemnification requirements are content-neutral, even though the court notes a number of concerns about whether the regulations are genuinely content-neutral in practice. But the court finds that UDOT cannot enforce either requirement as currently written because both provisions suppress more speech than is permissible under the narrowly tailored test. Completing the required analysis, the court finds that UDOT's policies leave open ample alternatives for communication and do not delegate overly broad licensing discretion to government officials.

A.    Content-Neutrality

The parties do not dispute that UDOT's insurance and indemnification provisions are content-neutral on their face, since they are applied uniformly to all permit applicants. Nevertheless, these provisions may impose greater burdens on groups with controversial messages because third-party insurers will inevitably evaluate the content of a group's speech when setting the rate for an insurance policy.

A number of courts have determined that private insurers are likely to apply content-, speaker-, and viewpoint-based criteria when determining whether to offer event liability insurance and, if so, how much to charge. *See, e.g.*, *E. Conn. Citizens Action Grp. v. Powers*, 723 F.2d 1050, 1056 n.2 (2d Cir. 1983) (stating that insurance companies often consider factors such as political beliefs, the likelihood of adverse publicity to the insurance company, and the organization's lack of business experience in deciding whether to accept or reject applications for insurance coverage); *Collin v. Smith*, 578 F.2d 1197, 1209 (7th Cir. 1978) (noting that "the [insurance] requirement does not turn on the content of a proposed demonstration, except in the

14

sense that controversial groups will likely be unable to obtain insurance, as here"); *Invisible Empire of the Knights of the Ku Klux Klan v. Mayor of Thurmont*, 700 F. Supp. 281, 285 (D. Md. 1988) (noting that the Ku Klux Klan could not obtain the required special event insurance because of the controversial nature of the group's message).

Not all courts have followed the reasoning in the cases cited above.  In *Thomas v. Chicago Park District*, the Seventh Circuit concluded that an insurance requirement did not involve content-based criteria because "the amount of insurance required [was] not . . . influenced by[] the nature of the event."  227 F.3d 921, 925 (7th Cir. 2000).  But the court also noted that "[t]he required amount *and the cost of the insurance* depend only on the size of the event and the nature of the facilities involved in it."  *Id.* (emphasis added).  The Seventh Circuit did not address the question of whether liability premiums were likely to be higher for more controversial speakers.[2]  Similarly, the Ninth Circuit found there was no First Amendment violation where a park required potential bandstand users to post a bond for liability insurance to cover equipment damage or liability resulting from an event's "unanticipated effects" on park visitors: "The bond requirement is content-neutral in that it is applied to every applicant regardless of the nature of the expression of the content of the message they wish to convey."  *Gerritsen v. City of Los Angeles*, 994 F.2d 570, 578-79 (9th Cir. 1993).  But in *Gerritsen*, the bond requirement was only imposed on applicants wishing to use the city's expensive sound system, and not for other expressive activity in the public park.  *Id.*  Moreover, it is not clear

---

[2]The Supreme Court affirmed the Seventh Circuit's decision.  *Thomas v. Chicago Park Dist.*, 534 U.S. 316 (2002).  But the petition for certiorari did not raise the insurance requirement and this question was therefore not before the court.  *See* Pet. for Writ of Cert., *Thomas v. Chicago Park Dist.*, 2001 WL 34091941, at *1 (Feb. 1, 2001).

whether the bond was set at a fixed amount for all users, or whether insurers could charge

different amounts for different users.

The different views on this subject are best expressed in *Santa Monica Food Not Bombs*

*v. City of Santa Monica*, 450 F.3d 1022 (9th Cir. 2006), in which the three-judge panel split over

whether an insurance and indemnification provision should be struck down on the grounds that

the requirement was not content-neutral.  The Honorable Marsha Berzon would have found the

provision unconstitutional, but the court's majority did not agree.  Reiterating her view in a later

case involving a Long Beach city regulation, Judge Berzon wrote:

> I continue to believe that an insurance requirement of the kind imposed by Long
> Beach is potentially content-based, and therefore invalid. . . .  I fully expressed
> this view, however, in *Food Not Bombs*, but did not prevail.  The *Food Not
> Bombs* majority did not acknowledge the substantial case law supporting my
> conclusion, and did not consider the likelihood that insurance premiums would
> . . . reflect the content of the permittee's expression and the likely reaction of
> bystanders to that content.

*Long Beach Area Peace Network v. City of Long Beach*, 574 F.3d 1011, 1044 (9th Cir. 2009)

(Berzon, J., concurring).

The court agrees with Judge Berzon's concerns.  But the court finds that there is

insufficient precedent for holding that a regulation that is content-neutral on its face can become

content-based by indirectly importing unidentified third-party insurers' decisions to place a

greater burden on controversial speech.  Instead, the Supreme Court has ruled that the

government's purpose in enacting a regulation is the primary factor a court should consider when

determining whether that regulation is content-based or content-neutral:

> The principal inquiry in determining content neutrality, in speech cases generally
> and in time, place, or manner cases in particular, is whether the government has
> adopted a regulation of speech because of disagreement with the message it

conveys.  The government's purpose is the controlling consideration.  A regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others.

*Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989).  Stated another way, "there is no disparate impact theory under the First Amendment."  *Norton v. Ashcroft*, 298 F.3d 547, 553 (6th Cir. 2002); *see also Van Arnam v. Gen. Servs. Admin.*, 332 F. Supp. 2d 376, 399 (D. Mass. 2004) ("The fact that a facially content-neutral regulation affects speakers professing a certain viewpoint more than others does not itself render the [statute] content or viewpoint based." (citation omitted) (internal quotation marks omitted)).[3]

Because UDOT's insurance and indemnification requirements are facially content-neutral and there is no evidence that the State of Utah enacted these regulations as a means to suppress a certain viewpoint, the court finds that the requirements are content-neutral.  Nevertheless, the court notes that UDOT's insurance requirement risks a future legal challenge from a group with a controversial message whose First Amendment activity is totally prohibited because no third-party insurer is willing to provide the group with the required special event insurance coverage.  The Plaintiffs here did not encounter this problem, and the court therefore will not speculate as to the outcome of such a lawsuit.  Instead, the court turns to the second prong in its analysis of UDOT's time, place, or manner restrictions.

---

[3]While their view has not yet been adopted in judicial decisions, the court notes that several scholars have leveled criticism at this approach to content-neutral regulations that have disparate content-based effects.  *See, e.g.*, Kathleen M. Sullivan, *Free Speech Wars*, 48 S.M.U. L. Rev. 203, 208-09 (1994) (comparing the "conventional view" that it is "not the fault of the state" that such regulations may result in unequal speaking opportunities to the quotation by Anatole France that "[t]he law, in its majestic equality, forbids the rich as well as the poor to sleep under bridges." (quoting Anatole France, *Le Lys Rouge* 91 (1894))).

17

B.      Narrow Tailoring

The second criterion for valid time, place, and manner restrictions requires the

government to demonstrate that its regulations are "narrowly tailored to serve a significant

governmental interest."  *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293 (1984).  A

narrowly-tailored permitting regulation does not need to be the "least restrictive or least intrusive

means" of furthering the government's substantial interest.  *Ward v. Rock Against Racism*, 491

U.S. 781, 798 (1989).  *See also id.* at 799 ("[T]he requirement of narrow tailoring is satisfied so

long as the . . . regulation promotes a substantial government interest that would be achieved less

effectively absent the regulation." (citation omitted) (internal quotation marks omitted)). But the

regulation may not burden substantially more speech than necessary to achieve a scheme's

important goal.  *See id.* at 799.

1.      *Significant Government Interest*

Before addressing whether UDOT's regulations are narrowly tailored, the court first

focuses on the significant government interest that is at stake.  The Supreme Court has held that

local governments can exercise their substantial interest in regulating competing uses of

traditional public fora by imposing permitting requirements for certain uses.  *See Cox v. New

Hampshire*, 312 U.S. 569, 574 (1941) ("The authority of a municipality to impose regulations in

order to assure the safety and convenience of the people in the use of public highways has never

been regarded as inconsistent with civil liberties but rather as one of the means of safeguarding

the good order upon which they ultimately depend.").  But the municipality of Salt Lake City

already has a permitting system in place that takes into account these competing uses, and the

Plaintiffs successfully obtained Salt Lake City's approval to march down State Street on a

specific date and time.  The State's interest is therefore separate from an interest in regulating

competing uses of State Street, since these determinations are made by Salt Lake City.

The State does not dispute this analysis but instead argues that its permitting requirements

are necessary to serve two additional government interests.  First, the State contends that it has a

significant interest in maintaining public order, preventing traffic and sidewalk obstructions, and

promoting safety.  *See Schenck v. Pro-Choice Network of W. New York*, 519 U.S. 357, 376

(1997).  Second, the State asserts that it has a legitimate interest in recovering expenses incurred

during the staging of a march, as well as in protecting itself from liability for injuries associated

with the use of its property.  *See Jacobsen v. Harris*, 869 F.2d 1172, 1174 (8th Cir. 1989); *Cox*,

312 U.S. at 576.  The court agrees that both of these interests are significant, but finds that the

permitting regulations at issue here bear little relationship to the first interest the State cites.

Unlike fees for police protection and traffic control, the costs of obtaining an insurance policy or

signing an indemnification form are not directly related to the safety of the march participants or

third-party bystanders.  The State has not presented any evidence that its regulations have any

effect on the likelihood that some sort of accident will occur during the event.  Instead, the

regulations focus on the State's interest in protecting itself from financial loss if such an accident

should occur.  As a result, only the State's second stated interest in protecting itself from

financial loss is relevant here.  The court therefore focuses its analysis on the question of whether

the State has narrowly tailored its regulations to serve this more limited interest.

Bearing this discussion in mind, the court considers the insurance and indemnification

provisions separately and finds that neither requirement is narrowly tailored.

19

2.       *Liability Insurance Requirement*

The State of Utah argues that its insurance regulation is narrowly tailored to serve the State's interest in protecting itself from financial loss because the regulation does not completely silence the Plaintiffs' speech.  Permit applicants for free speech events who cannot pay the premium for an insurance policy are still able to march on the sidewalks of State Street or on other streets in Salt Lake City that are not state highways.  Although the State concedes that there is an incidental effect on the Plaintiffs' speech, the State asserts that this burden is constitutionally permissible because the regulation satisfies the government interest while still allowing the Plaintiffs an ability to speak.

The Plaintiffs disagree with the State's interpretation and contend that the State has improperly conflated the government's need to narrowly tailor its regulations with its need to demonstrate ample alternatives for free speech.  According to the Plaintiffs, the State cannot simply rest on its observation that there are still fora available where the Plaintiffs can speak. Instead, the State must also show that the restrictions it has put in place do not burden substantially more speech than is necessary to achieve the State's significant interest.

The court agrees with the Plaintiffs.  Even if ample alternatives for speech exist, the State cannot simply prohibit a group from speaking in a traditional public forum without demonstrating how the State's restriction on speech is narrowly tailored to serve a significant interest.  Here, the State has presented no evidence of any tailoring at all.

a.       Examples of the Lack of Narrow Tailoring

While the court does not hold that the State must tailor its insurance requirement in any specific manner, the court notes a number of ways in which the current provision demonstrates

20

that the State has failed to give adequate thought to the scope of its regulations.  For instance, the State currently recognizes no distinction between permit applicants who wish to exercise their First Amendment rights and permit applicants for other special events, such as athletic races, filming, or commercial activities.  The State thereby requires the same amount of insurance coverage from all permittees, regardless of whether the group is organizing a political protest or a marathon.

Similarly, the State does not allow a free speech group to obtain a waiver from its insurance requirement, even if the group is indigent or only walking on a portion of a state road that poses minimal risk.  The portion of State Street that runs from the State Capitol to North Temple Street is only two lanes, for example, but the State regulations require the same amount of insurance coverage to march on this section of State Street as to march on the stretch of State Street that widens to multiple lanes of traffic or, for that matter, on a rural highway.  The State never suggested an alternate route to the Plaintiffs that would have avoided the most problematic sections of State Street while still allowing the group to march on the narrower section of State Street leading south from the State Capitol.

While this solution would have obviated some of the complaints made by the Plaintiffs, who contend that they were especially unable to march effectively on the narrow sidewalks between the State Capitol and North Temple Street, the court is not convinced that even the wider sections of State Street pose a serious threat of liability.  Indeed, a comparison with Salt Lake City's permitting requirements casts doubt on the State's assertion that an insurance requirement is necessary at all for free speech events in the downtown area of the city.  Unlike the State, Salt Lake City does not require protestors using the city streets to obtain an insurance

policy for a free expression event.  While the Defendants point out that State Street south of

North Temple Street is a busy thoroughfare with several lanes of traffic, there are certainly times

during the weekend when the amount of traffic on State Street is comparable to any other city

street in the downtown area.  The court finds it unlikely that an appreciably larger number of

accidents will occur during a march along State Street from North Temple Street to 400 South

than during a march along a similar distance of a downtown street that does not require a state

permit, such as 300 South or West Temple Street.  It is therefore unclear why the State is

exposing itself to more risk or has a greater need to protect itself from liability than does Salt

Lake City during a march on its streets.

> If the State is concerned about its financial risk from free speech events, there is no

reason that the State could not purchase its own insurance policy.[4]  The State argues that it has no

duty to subsidize a group's speech and the court does not mandate that the State must adopt such

an approach.  But the court notes that the State's argument appears to proceed from a flawed

premise—namely, that paying for the costs of a free speech event is a subsidy to the group that is

speaking.  As the Honorable Kermit Lipez on the First Circuit Court of Appeals wrote,

> [P]ublic speech is not a self-centered pursuit; it is speech *for* "the public."  Any
> assumption that the speaker is the primary beneficiary when he uses a public
> forum is incorrect: "This assumption ignores the benefit of the speaker's activities
> for the entire society.  His activities are part of the process by which a democratic
> society makes informed decision.  He speaks so that society can listen and decide
> for itself."  An individual who seeks a permit to disseminate a message about
> matters of public concern in a traditional public forum is thus exerting free speech
> rights that not only are explicitly promised by the Constitution but also are of
> value to the community as a whole.  Where such communal benefits exist, the
> government's countervailing interest in recouping costs solely from the individual

---

[4]Insurance coverage provided by the State would also reduce the risk discussed above that
a provider could charge a different premium based on the content of a group's speech.

is weaker.

*Sullivan v. City of Augusta*, 511 F.3d 16, 48 (1st Cir. 2007) (Lipez, J., dissenting) (citation

omitted).  The government's interest is also weaker where, as here, the State itself has argued that

the cost of an insurance premium is low, and the State could cover the Plaintiffs' constitutionally

protected march for a minimal amount.  Of course, this amount would increase if the State were

required to provide coverage for a large number of events, but the State has not provided any

evidence that it receives such a voluminous amount of applications for free speech events on

state roads that it would be infeasible to provide insurance coverage for them.

> b.      Conflict with the Supreme Court's *Claiborne* Decision

The Plaintiffs assert that an additional problem with UDOT's current insurance

requirement is that it conflicts with the Supreme Court's decision in *NAACP v. Claiborne*

*Hardware Co.*, 458 U.S. 886 (1982).  *Claiborne* dealt with a boycott of white merchants in

Claiborne County, Mississippi, that was organized by the National Association for the

Advancement of Colored People.  *Id.* at 889.  The merchants who were affected by the boycott

filed suit against the NAACP, claiming that they had lost revenues and that the NAACP had

tortiously interfered with their businesses.  *Id.* at 889-91.  The Supreme Court ruled that the

government could impose liability "for the consequences of violent conduct" but that the

NAACP could not be held liable "for the consequences of nonviolent, protected activity."  *Id.* at

909, 918.  In other words, the NAACP could not be held liable for the actions or reactions of

third parties who were not under the NAACP's control.

The Plaintiffs argue that UDOT's insurance provision conflicts with the *Claiborne*

decision because it requires the Plaintiffs to buy a policy without specifying what types of

23

incidents the policy must cover.  The regulation simply mandates a minimum $1,000,000

coverage per occurrence and $2,000,000 in aggregate.  This open language arguably requires the

Plaintiffs to insure not only against occurrences that can be attributed to the actions of a

participant in the march, but also against incidents for which the Plaintiffs cannot be held liable,

such as the reactions of third-party bystanders or the actions of police officers or other employees

of the State.

The Defendants maintain that an insurance premium is different from the liability

discussed in *Claiborne* since it "is simply a liquidated figure to cover the government's potential

risk."  *Courtemanche v. Gen. Servs. Admin.*, 172 F. Supp. 2d 251, 268 n.9 (D. Mass. 2001).  The

court agrees that an insurance premium can be viewed as a type of administrative cost and that

*Claiborne* does not specifically address this issue or otherwise bar a State from adopting a

regulation that requires free speech groups to purchase an insurance policy in certain situations.

But the court also agrees with the Plaintiffs' observation that UDOT's requirement as currently

written forces the Plaintiffs to purchase more insurance than necessary to cover losses for which

the group could legally be held liable.  The State's failure to address this inconsistency is

therefore another example of how the State has not narrowly tailored its insurance requirement.

c.      Overview of Cases from Other Jurisdictions

While the Tenth Circuit has not yet addressed the issue of mandatory insurance

requirements for free speech activities, the court has carefully examined a number of cases from

other district and circuit courts and finds that the majority of these cases support the court's

decision.  The court will summarize this substantial body of law by first reviewing decisions that

have considered the constitutionality of regulations imposing prohibitive costs generally on

permit applicants.  The court will then examine decisions that have addressed insurance requirements specifically.  Finally, the court will turn to the cases that have reviewed mandatory insurance requirements that are most analogous to the insurance provision at issue here.

i.      *Regulations Imposing Prohibitive Costs Generally*

A number of courts have found that regulations imposing prohibitive financial costs on the exercise of First Amendment rights are unconstitutional.  For instance, the Eleventh Circuit struck down an ordinance that required protesters to prepay for the costs of police protection because "[t]he granting of a license permit on the basis of the ability of persons . . . to pay an unfixed fee for police protection, without providing for an alternative means of exercising First Amendment rights, is unconstitutional."  *Cent. Fla. Nuclear Freeze Campaign v. Walsh*, 774 F.2d 1515, 1524-25 (11th Cir. 1985).  The United States District Court for the District of Connecticut held that a bond requirement to cover a city's costs of police protection and maintenance that did not contain an exception for indigent people was unconstitutional because the requirement "treat[ed] the First Amendment as a privilege to be bought rather than a right to be enjoyed."  *Invisible Empire Knights of the KKK v. West Haven*, 600 F. Supp. 1427, 1434 (D. Conn. 1985).  And in another case involving the Ku Klux Klan, the United States District Court for the District of Maryland ruled that a city's request for reimbursement for police protection and clean-up was unconstitutional because there was "no indication that the reimbursement condition would be waived or modified for indigents."  *Invisible Empire of the Knights of the KKK v. Mayor of Thurmont*, 700 F. Supp. 281, 286 (D. Md. 1988).

The Defendants argue that these cases are factually distinguishable because they involve groups who were unable to exercise their First Amendment rights if they did not pay the permit

fee.  The Defendants point out that the Plaintiffs here are not totally prohibited from speaking because they are free to march on other Salt Lake City streets or on the sidewalk.  The Defendants rely on two cases in which the First and Sixth Circuits upheld regulations requiring groups who wished to march in the city streets to pay a permit fee for the costs of traffic control, even though these regulations did not contain an exemption for indigent people.  *See Stonewall Union v. City of Columbus*, 931 F.2d 1130 (6th Cir. 1991); *Sullivan v. City of Augusta*, 511 F.3d 16 (1st Cir. 2007).  The holding in both of these decisions hinged on the existence of ample alternatives where the plaintiffs could speak.  *See Stonewall*, 931 F.2d at 1137 ("Because we believe the availability of the sidewalks and parks provides a constitutionally acceptable alternative for indigent paraders, we find that the lack of an indigency exception does not render the ordinance constitutionally invalid."); *Sullivan*, 511 F.3d at 42 ("We agree with [the Sixth Circuit's analysis in *Stonewall*] and find the situation in Augusta analogous.").  But a permissible time, place, or manner restriction must still be narrowly tailored, even if ample alternatives for speech exist.  Otherwise, the government could arbitrarily ban street marches altogether by citing the availability of the sidewalks or other public fora.

Moreover, the regulations at issue in *Stonewall* and *Sullivan* did not involve insurance provisions.  Instead, the required permit fees covered the costs of traffic control and other costs directly associated with the administration of the parade.  In *Stonewall*, the Sixth Circuit compared these fees to the parade fees that the Supreme Court upheld in *Cox v. New Hampshire*, 312 U.S. 569 (1941).  The Sixth Circuit characterized the Supreme Court's holding as follows:

> The Supreme Court considered a municipality's right to impose a license fee for parade permits and found that as long as the fee was designed to meet the expenses incident to the administration of the law and the cost of maintaining

26

public order for the parade, such a charge did not impermissibly burden First Amendment rights.

*Stonewall*, 931 F.2d at 1133.

But even if the cost of obtaining an insurance policy can be analogized to an administrative fee, the premium cost is distinct from the fees at issue in *Cox*. Unlike the costs of traffic control or of maintaining a police presence, the insurance cost is related only to the risk of liability and not to public safety. As discussed above, the government's significant interest is therefore limited to its financial risk and is comparatively weaker. As a result, the court finds that the rulings in *Stonewall* and *Sullivan* are not as persuasive as the holdings in cases dealing specifically with insurance requirements.

### ii. *Regulations Containing Insurance Provisions*

Where courts have considered insurance provisions specifically, they have tended to strike them down. For instance, the United States District Court for the Eastern District of Pennsylvania held an insurance requirement unconstitutional "[b]ecause defendants can satisfy the interests of the Commission in the circumstances presented here with more narrow and less restrictive measures such as prudent site selection and policing." *Wilson v. Castle*, 1993 WL 276959, at *4 (E.D. Pa. July 15, 1993). And in one of the Ku Klux Klan cases discussed above, the court noted that"[t]he Town has made no showing that insurance or a hold harmless agreement is even necessary." *Invisible Empire*, 700 F. Supp. at 285. As a result, the court held that "the Town could more narrowly serve its interest in safety by criminalizing conduct which causes injury to persons or property and by arresting violators of its criminal laws." *Id.*

While the Ninth Circuit has upheld insurance requirements, it has done so where these

27

requirements were not mandatory in the permitting scheme.  In *Santa Monica Food Not Bombs v. City of Santa Monica*, the permitting regulation allowed an applicant to waive the insurance requirement provided that the applicant signed an indemnification agreement and did not have a history of personal injury or property damage claims awarded against the applicant arising out of previous free speech events.  450 F.3d 1022, 1028 (9th Cir. 2006).  The majority noted:

> Political demonstration organizers can even avoid both the hold harmless [indemnification] provision and the insurance provision if they cooperate with the City Manager to design the event "to respond to specific risks, hazards and dangers to the public health and safety identified by the City Manager or his/her designee as being reasonably foreseeable consequences of the permitted event." Thus most demonstration organizers will not have to provide insurance[.]

*Id.* at 1057 (citation omitted).  Similarly, the regulation at issue in *Long Beach Area Peace Network v. City of Long Beach* provided an exception to its insurance requirement for events involving "expressive activity."  574 F.3d 1011, 1030 (9th Cir. 2009).  To qualify for the exception, an applicant was required to either sign an indemnification agreement or "agree to redesign or reschedule the permitted event to respond to specific risks, hazards and dangers[.]" *Id.* at 1030-31.  Accordingly, the insurance requirements in both the Santa Monica and Long Beach regulations were not mandatory because a free speech event organizer could avoid them by working with the city manager to respond to specific risks.

       iii. *Regulations Containing Mandatory Insurance Provisions*

   The majority of courts that have considered mandatory insurance requirements most similar to the regulation at issue here have found these requirements unconstitutional.  In *Eastern Connecticut Citizens Action Group v. Powers*, the Second Circuit invalidated an insurance requirement that the Connecticut Department of Transportation imposed on a group of marchers

who wanted to use an abandoned rail bed for a march about environmental issues.  723 F.2d

1050, 1052 (2d Cir. 1983).  The court found that the requirement to obtain adequate liability

coverage for the march substantially infringed the group's First Amendment rights in a manner

that was unjustified by the government's proffered interest.  *Id.* at 1057.  The court noted that the

environmental organization had been diligent and cooperative in its attempts to ensure the safety

of the marchers and found that the state had failed to show why "existing civil and criminal

sanctions for trespassing, vandalism, and so on" were insufficient to protect the state from the

risk of liability.  *Id.* at 1057.  The court applied strict scrutiny to the insurance requirement

because the case was decided before the Supreme Court adopted the heightened scrutiny standard

for content-neutral time, place, and manner regulations.  *See Ward v. Rock Against Racism*, 491

U.S. 781, 798 (1989) ("Lest any confusion on the point remain, we reaffirm today that a

regulation of the time, place, or manner of protected speech must be narrowly tailored to serve

the government's legitimate, content-neutral interests but that it need not be the least restrictive

or intrusive means of doing so.").  Although it is unclear whether the Second Circuit would have

reached the same conclusion using the narrowly tailored standard, the court's reasoning suggests

that the outcome of the case would have not have changed.

The United States District Court for the Southern District of New York applied

intermediate scrutiny to a mandatory insurance requirement and found that the regulation was not

a narrowly tailored means of furthering the government's interest in limiting its financial

liability.  *Coe v. Town of Blooming Grove*, 567 F. Supp. 2d 543 (2008), *aff'd in part and vacated

in part*, 429 F. App'x 55 (2d Cir. 2011).  In that case, plaintiff Alexandra Coe wanted to hold a

peace rally in the Village of Washingtonville, which is a municipality located in the Town of

Blooming Grove.  567 F. Supp. 2d at 548.  The Town Supervisor informed Ms. Coe that she was

required to purchase an insurance policy and that this requirement could not be waived, even if

Ms. Coe was unable to afford the premium.  *Id.* at 549.  Ms. Coe then brought suit challenging

various aspects of the Village and Town regulations, including requirements under both codes

that a speaker obtain liability insurance.  Noting that "more narrow and less restrictive measures

such as prudent . . . policing" could also accomplish the government's interest in limiting liability

arising out of a public gathering, the court found that the Town insurance requirement was not

narrowly tailored: "[T]he burden that the failure to exempt indigent persons from the insurance

requirement places on the exercise of First Amendment rights is too great to justify whatever

marginal benefit this provision confers on the Town."  *Id.* at 564, 566 (citation omitted).  The

court then adopted the same reasoning to strike down the Village insurance requirement.  *Id.* at

567-68.

    The Second Circuit upheld the district court's decision striking down the Town

regulation, but did so on alternative grounds.  429 F. App'x at 58.  The court found that the

Town's selective enforcement of its insurance regulation constituted viewpoint discrimination

and declined to reach the district court's narrowly tailored analysis.  *Id.*  The Second Circuit

overturned the district court's decision regarding the Village regulation, but it did so because the

district court failed to notice the following exemption in the Village Code: "An applicant who

seeks to use Village property outside of a building for First Amendment purposes shall not be

required to provide liability insurance."  *Id.*  Because the Village did provide an exception to its

policies for speakers exercising their First Amendment rights, the Second Circuit did not need to

decide whether the Village regulations would have been narrowly tailored in the absence of such

30

an exception.

Most analogous to the facts currently before the court is the decision of the United States

District Court for the District of Massachusetts in *Van Arnam v. General Services*

*Administration*, 332 F. Supp. 2d 376 (D. Mass. 2004). In *Van Arnam*, the plaintiff applied for a

permit to hold a rally outside the John F. Kennedy Federal Building in Boston. *Id.* at 379. The

General Services Administration, the federal agency charged with administering the property,

required the plaintiff to sign an indemnification clause. *Id.* The court found that the provision

was equivalent to an insurance requirement because "while the Clause does not technically

compel event insurance, the realities require all but the judgment-proof and the foolhardy to give

very serious consideration to purchasing private insurance." *Id.* at 394. Applying intermediate

scrutiny, *see id.* at 395, the court held that the indemnification requirement was not narrowly

tailored to serve a significant government interest as applied to a person who "cannot reasonably

afford the financial demands it makes." *Id.* at 407. The court cited favorably the following

reasoning from the Second Circuit's decision in *Eastern Connecticut Citizens Action Group*:

> While the state has a legitimate interest in protecting itself from liability for
> injuries associated with the use of its property, . . . [a]bsent a showing that those
> carefully-crafted remedies [marchers' efforts to minimize the risk of injury or
> damage, waivers of claims against the state, and existing civil and criminal
> sanctions for trespassing, vandalism, etc.] are unavailing in this instance, the state
> may not insist upon broader restrictions which substantially infringe constitutional
> rights.

*Id.* at 404-05 (citing *E. Conn. Citizens*, 723 F.2d at 1056-57).

Importantly, the *Van Arnam* court reached its decision despite finding that the plaintiff

was not indigent. *Id.* at 406. Even though the plaintiff may have been able to afford insurance

for the planned event, the court found that the indemnification provision created a financial

burden that "could (and in fact did) completely deter her from speaking on federal property." *Id.*

Here, UDOT's insurance and indemnification requirements also deterred speakers from marching

on state property, regardless of whether the Plaintiffs may have been able to afford an insurance

premium. Also similar to the facts here, the *Van Arnam* court found that the indemnification

provision did not foreclose adequate alternative channels of communication. The plaintiff in *Van*

*Arnam* could have held, and indeed did hold, her rally on the city-owned City Hall Plaza, which

was adjacent to and within site of the John F. Kennedy Building. Nevertheless, the court

concluded that the indemnification requirement was not narrowly tailored to serve a significant

government for the reasons discussed above.

In *Sullivan v. City of Augusta*, the First Circuit disagreed with the district court's holding

in *Van Arnam*:

> The case perhaps most helpful to the plaintiffs is *Van Arnam v. GSA*, where the
> district court, relying on several of the above cases, held unconstitutional an
> indemnification/hold harmless requirement on the grounds that the absence of an
> indigency waiver suppressed more speech than was necessary and thus was not
> narrowly tailored. The analysis did not thus turn on the availability of alternative
> means of expression (which the district court had found were available). To the
> extent that [*Sullivan* and *Van Arnam*] are comparable, we disagree with the
> narrow tailoring conclusion in *Van Arnam*.

511 F.3d 16, 42 n.15 (1st Cir. 2007). While a circuit court's opinion is generally more

persuasive than the decision of a district judge, the court prefers the *Van Arnam* court's approach

for two reasons. First, the facts in *Van Arnam* are more analogous to the facts currently before

the court because the *Van Arnam* court specifically addressed a requirement related to reducing

the government's putative liability for events on its property, whereas the *Sullivan* court

examined a provision related to reducing the known and measurable costs of clean-up and traffic

control.  Second, the *Van Arnam* court considered both whether the disputed regulation was

narrowly tailored and whether ample alternatives for speech existed.  The court finds that a time,

place, or manner restriction must satisfy both requirements.

      In contrast to the decisions cited above, courts that have upheld mandatory insurance

requirements have generally done so in cases with facts that are distinguishable from the facts at

issue here, or in cases with a different procedural posture.  *See Gerritsen v. City of Los Angeles*,

994 F.2d 570 (9th Cir. 1993) (upholding insurance provision where the regulation was reasonable

to protect the value of expensive state-owned sound equipment); *CAMP Legal Def. Fund, Inc. v.

City of Atlanta*, 451 F.3d 1257 (11th Cir. 2006) (holding that an insurance policy requirement

was permissible where the policy was only required for events of more than 10,000 people);

*Urlaub v. Inc. Village of Bellport*, 498 F. Supp. 2d 614 (E.D.N.Y. 2007) (denying plaintiff's

motion for a preliminary injunction not only because the plaintiffs failed to demonstrate a

likelihood of success on the merits of their challenge to the facial constitutionality of an

insurance and indemnification provision, but also because the plaintiffs could recover the

insurance premium if they eventually prevailed and therefore suffered no irreparable injury).

      The case that most mirrors the facts of this lawsuit is *Thomas v. Chicago Park District*, in

which the Seventh Circuit upheld a regulation that required organizers of events in city parks to

obtain liability insurance for events of more than fifty people.  227 F.3d 921 (7th Cir. 2000), *aff'd*

534 U.S. 316 (2002).  But the plaintiffs in *Thomas* did not argue that the city had failed to

narrowly tailor its regulations:

> Petitioners do not argue that the Park District's ordinance fails to satisfy other
> requirements of our time, place, and manner jurisprudence, under which the
> permit scheme "must not be based on the content of the message, must be

> narrowly tailored to serve a significant governmental interest, and must leave open
> ample alternatives for communication."

534 U.S. at 323 n.3.  Instead, the plaintiffs argued that the regulations were excessively vague

and constituted a prior restraint.  227 F.3d at 923.  As discussed above, the Seventh Circuit found

that the regulations were applied in a content-neutral manner because the amount of insurance

required depended only on the size of the event and the nature of the facilities that would be

used.  *Id.* at 925.  On appeal, the Supreme Court considered the question of whether the

regulations gave the permitting officials too much discretion and found that they did not.  534

U.S. at 324.  Neither court addressed the question of whether the insurance requirement was

narrowly tailored to serve a significant government interest.

Given the number of cases that have struck down insurance requirements that are similar

to UDOT's provision, and the lack of any contrary authority in a case that is directly analogous to

the facts and arguments presented here, the court finds that the regulation requiring the Plaintiffs

to obtain liability insurance for their march is not narrowly tailored.  There is no evidence that the

State has tailored its insurance requirement at all to serve its interest in avoiding liability.

Instead, the State assumes that the ordinary mechanisms for protecting itself from liability will

fail, and imposes a speech-burdening condition as a matter of course.  Because the insurance

requirement burdens substantially more speech than necessary to achieve the State's interest, the

court finds that the regulation is unconstitutional.

3.   *Indemnification Requirement*

The court addresses UDOT's indemnification requirement separately because it covers a

slightly different scope of liability than the insurance requirement.  Notably, the State of Utah has

34

amended its regulations so that the indemnification provision is no longer as broad as it once was.  Nevertheless, the court finds that the current indemnification provision is still not narrowly tailored to serve the State's significant government interest.

After the Plaintiffs filed their lawsuit, the State changed its regulations so that free speech participants were no longer required to sign a waiver that released the State from all liability for any claims that resulted from participation in the march.  The State now requires free speech participants to sign an indemnification form, which requires a permittee to "indemnify, defend, and hold . . . harmless" the State of Utah and its relevant agencies from certain types of claims. The State argues that the indemnification form is constitutionally adequate because it only requires indemnity against (a) acts by the Plaintiffs or persons under the Plaintiffs' control "insofar as permitted by law"; and (b) actions and claims that are brought by reason of the Plaintiffs' non-observance or non-performance of any of the terms of the permit or other laws and regulations.  (*See Indemnification Form.*)

The current indemnification form avoids the problems of the hold harmless provision that the Ninth Circuit struck down in *Long Beach Area Peace Network v. City of Long Beach*, 574 F.3d 1011 (9th Cir. 2009).  The Ninth Circuit found that the Long Beach regulation was not narrowly tailored because it required a free speech group to indemnify the city for any accidents or injuries associated with the speech activity, even if the incidents were not caused by a member of the group.  *Id.* at 1039-40.  The Ninth Circuit held that this aspect of the regulation violated *Claiborne*'s prohibition against imposing liability on a speaker for actions outside of the speaker's control.  *Id.*  UDOT's indemnification form is less broad than the Long Beach regulation because it only imposes liability on the permittee and parties under the permittee's

control.

> The Ninth Circuit upheld a similar requirement in *Kaahumanu v. Hawaii*:

> In contrast to *Long Beach*, the indemnification/hold-harmless clause in this case does not require a permittee to hold the state harmless for all consequences of the event, including those caused by the state's own actions.  The clause here is much narrower, requiring a permittee to indemnify and hold Hawaii harmless only for "any act or omission *on the part of [the] Applicant*," "any failure *on the part of [the] Applicant*" to maintain the premises, and all "claims . . . made *by reason of Applicant's*" failure to follow the permit Terms and Conditions.

682 F.3d 789, 810 (9th Cir. 2012) (emphasis in original).  By mirroring the indemnification clause upheld in *Kaahumanu*, UDOT's indemnification form avoids the type of broad liability that is prohibited by *Claiborne*.

Even so, a violation of *Claiborne* is only one way in which a regulation can fail to be narrowly tailored.  The court must still determine whether, despite the Defendants' attempts to circumscribe the extent of the indemnification form's reach, the regulation nevertheless burdens substantially more speech than necessary to achieve the government's significant interest.

The court finds that the indemnification requirement supports the State of Utah's government interest only minimally, and that it does so by placing a significant burden on speech.  Without the indemnification agreement, there is little doubt that the State could hold an organization directly liable for any property damage or injuries caused by members of the organization during a march.  Consequently, the major function of the indemnification form is simply to turn traditional tort liability into contractual liability under the agreement.  While the State may gain some financial advantages from this approach, such as the ease of recovering attorneys' fees and other litigation costs, the State has failed to demonstrate what these advantages are or why they are needed.  For instance, the State has presented no evidence that

litigation resulting from free speech events has placed a financial strain on the State's resources. Instead, the State merely asserts that the indemnification requirement is necessary for the State's protection, thereby assuming that the traditional legal remedies of civil and criminal liability for property damage and personal injury are for some reason insufficient in the context of public demonstrations and marches. The court finds no evidence that supports this assumption.

While the State's financial interest in the indemnification requirement is somewhat speculative, the burden that the indemnification provision imposes on individuals wishing to exercise their First Amendment rights is real. By signing the agreement, an organization exposes itself to an unknown amount of liability. The organization is required to defend the State against all third-party claims alleging some action by a member of the organization, even if those claims are frivolous. Third parties who disagree with the content of the organization's speech could use this tactic to punish an organization after the event. Judge Berzon summarized this point of view in her dissent in *Santa Monica Food Not Bombs v. City of Santa Monica*:

> While the indemnification provision and the actual indemnification agreement do not make permittees potentially liable for actions of hecklers who attend the event, they do not protect permittees from bearing liability for lawsuits brought by a different sort of heckler who, after the fact, seeks to make permittees liable for damages for actions which allegedly occurred during the event, whether or not the actions actually occurred.

450 F.3d 1022, 1051 n.26 (9th Cir. 2009) (Berzon, J., dissenting). While this sort of heckler's veto may be unlikely, the important point is that an event organizer has no way to determine how much liability she is exposing her organization to by signing the indemnification form. As a result, the indemnification requirement may dissuade a large number of potential speakers from exercising their rights.

While the Defendants point to number of cases to support their argument that the indemnification requirement is narrowly tailored, the court finds that all of these cases are distinguishable.  Although the Ninth Circuit upheld a similar indemnification clause over Judge Berzon's vigorous dissent in *Santa Monica Food Not Bombs*, the court likely would have reached a different result if the plaintiffs had argued that the clause was not narrowly tailored.  One of the two judges in the majority, the Honorable Kim Wardlaw, upheld the clause because she found that it was content-neutral.  *Id.* at 1058.  But Judge Wardlaw indicated that the plaintiffs had not put forward their strongest argument: "Food Not Bombs failed to raise what might have been the better argument: that Santa Monica's content neutral indemnification provision is not narrowly tailored to legitimate government interests."  *Id.*

And although the Defendants argue that their indemnification provision is similar to the clause that the Ninth Circuit upheld in *Kaahumanu*, the *Kaahumanu* case did not involve political speech.  Instead, the regulations at issue in *Kaahumanu* concerned permits for weddings and other "commercial activity" on the public beaches of Hawaii.  682 F.3d at 794.  Here, UDOT's regulation of protests and other marches implicates the type of "[c]ore political speech [that] occupies the highest, most protected position" in the Supreme Court's "rough hierarchy" of free speech protection.  *R.A.V. v. City of St. Paul*, 505 U.S. 377, 422 (1992) (Stevens, J., concurring).  It is unclear whether the Ninth Circuit would have upheld an indemnification agreement identical to the provision in *Kaahumanu* if the State of Hawaii required all political event organizers to sign the agreement before being allowed to use the public beaches for demonstrations or other free speech activities.

Finally, the Defendants rely on *Nationalist Movement v. City of York*, in which the Third

Circuit upheld a hold-harmless requirement for use of the city's public parks that applied only to damages for which the speaker could legally be held liable.  481 F.3d 178, 186 n.9 (3d Cir. 2007).  But the court did not base its decision solely on its observation that the hold-harmless clause had a "narrow scope."  *Id.*  The court also relied on York's representation during oral argument that the hold-harmless provision was subject to a waiver provision found elsewhere in the city's ordinances.  *Id.*  Under the waiver provision, the city waived its requirement that an applicant pay a user fee and obtain liability insurance for the applicant's event "if the activity is protected by the First Amendment of the United States Constitution and the requirement would be so financially burdensome that it would preclude the applicant from using Park property for the proposed activity."  *Id.* at 181 (citation omitted).  The Third Circuit's decision therefore hinged in part on the existence of an indigency exception to the defendant's indemnification requirement.  Here, UDOT's regulations do not allow the permitting officials to waive the indemnification requirement for an indigent group.

Given the lack of factual similarity, the court finds that the cases on which the Defendants rely are inconclusive.  But these cases are not the only source of guidance on this issue.  Permit applicants who are required to sign an indemnification clause must either purchase insurance to protect themselves or self-insure by default.  As a result, the reasoning in the numerous cases considering insurance provisions is equally applicable to the court's analysis of whether the indemnification clause is narrowly tailored.  For the reasons discussed above, the majority of these decisions support the court's ruling that UDOT's indemnification requirement is not narrowly tailored to achieve a significant government interest.

The State has not provided any evidence that the indemnification agreement protects the

State from financial loss due to claims for property damage or personal injury that occur as a result of a group's actions during a free speech event.  If a march participant vandalizes public property or harms a third party, the State may utilize presently existing criminal and civil sanctions to hold responsible parties liable.  The main protection the State appears to derive from the indemnification requirement is that it dissuades prospective speakers from using public fora that are under the State's control.  But such a goal is in plain conflict with the State's First Amendment obligations.  Accordingly, the court finds that the indemnification provision as currently written burdens substantially more speech than necessary to achieve the State's government interest, and is therefore unconstitutional.

> C.    <u>Alternatives for Communication</u>

The parties dispute whether UDOT's current permitting scheme leaves open ample alternatives for communication.  The Defendants argue that the Plaintiffs have access to two readily available alternatives even if they are unable to march on State Street.  First, the Plaintiffs are not barred from marching on the sidewalks lining State Street.  Second, the Plaintiffs are free to march on adjacent streets without obtaining a permit from UDOT.

The Plaintiffs respond that street marches carry special significance and that State Street specifically provides a unique focal point for their march, in which they wish to promote the message that state and local legislatures should take action on climate change.  The Plaintiffs submit the views of their expert, Dr. Andrew Utterback, who claims that sidewalks do not provide a backdrop that resonates with the historical power of street marches.  The Defendants contest the relevance of this testimony and have moved to exclude Dr. Utterback's testimony.

The court need not determine whether Dr. Utterback possesses the necessary

qualifications to serve as an expert in this matter because his opinion is amply represented in other cases.  In *Sullivan v. City of Augusta*, for instance, Judge Lipez described a number of ways in which sidewalk marches were likely to be less effective than street marches:

> If a march is confined to the sidewalks, the perception that space is limited, and that fewer marchers can therefore be accommodated, will reduce the number of participants. . . .  Indeed, such concerns are likely to suppress the number of spectators as well, with shoppers and others altering their routes to avoid the sidewalk congestion.  The resulting reduction in the number of marchers, as well as spectators, dilutes the message that is delivered[.]

511 F.3d 16, 51-52 (1st Cir. 2007) (Lipez, J., dissenting).  Although Judge Lipez was writing in dissent, his concerns were echoed by the Ninth Circuit: "Street parades afford greater visibility to the marchers than parading down the sidewalk, and may also allow marchers to proceed abreast, march behind a horizontal banner and more easily distribute materials to pedestrians on both sides of the street."  *Seattle Affiliate of the Oct. 22nd Coal. to Stop Police Brutality v. City of Seattle*, 550 F.3d 788, 796 (9th Cir. 2008).

The Tenth Circuit has not decided whether the availability of sidewalks provides an adequate alternative to street marches.  But the sidewalks were not the only available alternative for the Plaintiffs here; they were also allowed to march on adjacent streets.  Given the proximity of these adjacent streets to the Plaintiffs' desired parade route, the court finds that UDOT's insurance and indemnification requirements did not foreclose adequate alternative channels of communication for the Plaintiffs to convey their message to their intended audience.

Nevertheless, the court agrees with the Plaintiffs that State Street, which runs past the Utah State Capitol, the United States Federal Building, the Utah State Courthouse, and the Salt Lake City and County Building, possesses deep historical and political significance in Utah.

Even if nearby streets provide the Plaintiffs ample alternatives for communicating their message, it is unlikely that a street march on an adjacent roadway would be as symbolic or as effective as a march down State Street. The Defendants cannot cut off access to this important public forum simply because adequate alternatives for communication exist. Instead, the Defendants must show that the restrictions they have imposed on State Street are narrowly tailored to serve a significant government interest. Because they have failed to do so, even the presence of ample alternatives for communication cannot save the offending provisions.

      D.    <u>Administrative Discretion</u>

The parties do not dispute that, as currently written, the UDOT regulations are applied uniformly to all permit applicants. These regulations therefore do not delegate overly broad licensing discretion to any government officials. The Defendants argue that a perverse result of adding an indigency exception to the State's permitting scheme would be that it would grant the permitting officials more discretion in their decisions. If the criteria for determining whether a group was indigent were too vague, the new regulations would no longer be content-neutral because the permitting officials could make their indigency decision based not on a group's financial circumstances, but on the content of the group's message.

While UDOT would of course need to be wary of this possibility if the State chose to create an indigency exception, the court does not believe that the challenge is insurmountable. As Judge Lipez noted in his dissent in *Sullivan*, a number of cities have adopted various approaches for determining eligibility for indigency exemptions without delegating too much discretion to the permitting officials. *See Sullivan*, 511 F.3d at 55-57 (citing favorably the permitting schemes in Pittsburgh and Minneapolis). The court sees no reason why the State of

Utah would be unable to develop a similar set of content-neutral standards if it chose to do so.

**VI.    Damages**

The Plaintiffs request that the court award them at least nominal damages under 42 U.S.C. § 1983 for the violation of their First Amendment rights.  The Plaintiffs seek these damages against the named UDOT officials in their individual capacity.  The individual Defendants argue that, even if they violated the Plaintiffs' constitutional rights, they are nevertheless protected from the Plaintiffs' claims under Section 1983 by the doctrine of qualified immunity.

The doctrine of qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  "Once a defendant raises the defense of qualified immunity as a defense to an action, '[t]he plaintiff carries the burden of convincing the court that the law was clearly established.'"  *Powell v. Mikulecky*, 891 F.2d 1454, 1457 (10th Cir. 1989) (quoting *Pueblo Neighborhood Health Ctrs., Inc. v. Losavio*, 847 F.2d 642, 645 (10th Cir. 1988)).  The plaintiff must "come forward with facts or allegations sufficient to show both that the defendant's alleged conduct violated the law and that the law was clearly established when the alleged violation occurred."  *Pueblo Neighborhood*, 847 F.2d at 645.

"Ordinarily, in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains."  *Weigel v. Broad*, 544 F.3d 1143, 1153 (10th Cir. 2008) (quoting *Cruz v. City of Laramie*, 239 F.3d 1183, 1187 (10th Cir.

2001)).  This does not require that the plaintiff show that the very act in question was previously

held unlawful.  Rather, the contours of the law "must be sufficiently clear that a reasonable

official would understand that what he is doing violates that right."  *Hope v. Pelzer*, 536 U.S.

730, 739 (2002).

      Here, there is no clear Tenth Circuit precedent on this issue.  And although the court finds

that the weight of existing precedent from other jurisdictions supports the court's finding that the

Plaintiffs' First Amendment rights were violated, the contours of the law are not sufficiently

clear that the Defendants should have known that the UDOT regulations were unconstitutional.

Indeed, there is no evidence that the Defendants acted in bad faith or with any belief that any of

their permitting requirements were constitutionally deficient.  The unsettled state of the law in

this area demonstrates that the Defendants' assumptions, though incorrect, were not

unreasonable.  As a result, the court finds that the Defendants are entitled to qualified immunity

and awards no damages to the Plaintiffs under 42 U.S.C. § 1983.

      The Plaintiffs may nevertheless seek to recover their reasonable attorneys' fees under 42

U.S.C. § 1988.  This statute provides that "the prevailing party" in certain civil rights actions,

including suits brought under Section 1983, may recover "a reasonable attorney's fee."  The

Supreme Court has held that a plaintiff is the prevailing party if she is successful on her claims

for injunctive or declaratory relief, even if the court declines to award any damages.  *See*

*Lefemine v. Wideman*, 133 S. Ct. 9, 11 (2012).  Mr. Mateus and iMatter Utah are therefore

prevailing parties, and they "should ordinarily recover an attorney's fee unless special

circumstances would render such an award unjust."  *Id.* (citing *Hensley v. Eckerhart*, 461 U.S.

424 (1983)).

CONCLUSION

For the reasons stated above, the court finds that UDOT's regulations requiring a free speech applicant to obtain liability insurance and sign an indemnification form are not narrowly tailored to serve a significant governmental interest.  As a result, the court holds that these regulations violate the First Amendment.  The court enjoins the Defendants from enforcing these requirements as currently written against applicants who request a permit from the State for a free speech event.

The Plaintiffs' claims based on previous versions of UDOT's regulations, including the waiver and advanced identification requirements that the State no longer enforces against applicants for free speech activities, are dismissed as moot.  The court also dismisses the Plaintiffs' claims for violation of their due process rights under the Fifth and Fourteenth Amendments.

The court finds that the Defendants are entitled to qualified immunity and therefore awards no damages to the Plaintiffs for the violation of their First Amendment rights.  But the court grants the Plaintiffs leave to file a motion for reasonable attorneys' fees and costs under 42 U.S.C. § 1988.

In accordance with the court's ruling above, the Plaintiffs' Motions for Partial Summary Judgment (Dkt. 51 & 110) and the Defendants' Motion for Summary Judgment (Dkt. 81) are all GRANTED IN PART AND DENIED IN PART.  Mr. Mateus's Motion to Strike Affirmative Defenses (Dkt. 46) and the Defendants' Motion to Exclude the Testimony of Dr. Utterback (Dkt. 78) are DENIED AS MOOT.

The court orders the Clerk of the Court to close the case.

SO ORDERED this 4th day of November, 2013.

BY THE COURT:

_____
ROBERT J. SHELBY
United States District Judge